Filed 6/9/16  In re Roxanne S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROXANNE S., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> M.N., <br><br>     Defendant and Appellant. | A146269 <br><br> (Alameda County Super. Ct. No. OJ13021634) |

At a Welfare and Institutions Code section 366.26 selection and implementation hearing,[1] the juvenile court terminated mother M.N.'s parental rights to her daughter, Roxanne, and ordered adoption as the permanent plan.  M.N. appeals, contending the court erred in terminating her parental rights because the continuing beneficial relationship exception to termination applied.  We conclude there was no error, and we affirm.

## BACKGROUND

### The Petition

On September 19, 2013, Alameda County Narcotics Task Force personnel executed a search warrant at the apartment where M.N. and Roxanne lived.  They

_____

[1] All statutory references are to the Welfare and Institutions Code.

1

discovered four pounds of marijuana accessible to Roxanne at various locations throughout the apartment (including in her backpack). They also found two loaded weapons accessible by Roxanne, ammunition in her diaper bag, and a can containing methamphetamine in the refrigerator. M.N. denied any knowledge of the drugs and weapons, claiming they belonged to her boyfriend. She was arrested for possession of methamphetamine and marijuana for sale, possessing and receiving stolen property, possession of a loaded firearm, possession of methamphetamine, and child endangerment.[2] Roxanne, who was five years, eight months old at the time, was taken into emergency protective custody.

The Alameda County Social Services Agency (Agency) filed a section 300 petition that, as twice amended, asserted that M.N. failed to protect Roxanne based on the events of September 19 and M.N.'s arrest.[3]

**Detention, Jurisdiction, and Disposition**

On September 24, Roxanne was ordered detained. She was placed with her paternal aunt, Melissa L.

In a combined jurisdiction/disposition report, the Agency recommended the court assume jurisdiction, order out-of-home placement for Roxanne, and order reunification services for M.N.

On October 8, the matter came on for a jurisdictional/disposition hearing, and M.N. submitted on the report. The court found the allegations in the amended petition to be true, ordered Roxanne's removal from her mother's custody, and ordered the Agency to provide reunification services to M.N.

The case plan for M.N. established the following service objectives: comply with all court orders; maintain a relationship with Roxanne by following the visitation plan;

_____

[2] The charges were later dismissed.

[3] It also alleged that Roxanne's father was a methamphetamine abuser, had recently been incarcerated, and was on probation for carjacking, theft, and receiving stolen property. M.N. had sole legal and physical custody of Roxanne. As this appeal is brought only on behalf of M.N., we omit details regarding Roxanne's father except where relevant to the issues before us.

2

obey the law and avoid arrests and convictions; demonstrate acceptance of responsibility for her actions; and treat others with respect. M.N.'s client responsibilities were to engage in counseling/mental health services and complete a parenting education course and an outpatient substance abuse treatment program with random drug testing.

**Six-Month Review**

In its six-month status review report prepared on February 24, 2014, the Agency characterized M.N.'s progress during the review period as "minimal." She had been referred to substance abuse services at the Terra Firma Diversion Program (Terra Firma), but she had not started the treatment program. She had four clean tests in November, December, and January. In December, she provided a prescription for Hydrocodone (an opiate) and thereafter had six positive tests for opiates in December and January. She had two "abnormally" diluted tests in January, and failed to show for two tests in February.

M.N. was also referred to parenting classes at Terra Firma but had been terminated due to excessive absences. She had been referred to Pathways to Wellness for counseling services and was supposed to attend twice per month, but as of January 31, 2014, she was attending only once a month.

M.N. had consistently visited with Roxanne on a weekly basis. The visits had first occurred at Melissa's home and were appropriate. By mid-December, M.N. was permitted two-hour, unsupervised visits, which increased to three hours in January 2014. M.N. often returned Roxanne 20 minutes late but would send a text that she was running late. During a visit on February 1, however, M.N. and Melissa got into a verbal altercation in front of Roxanne after Melissa expressed concern about whether Roxanne was being transported by a licensed driver. M.N. returned Roxanne one hour late from that visit. On February 4, the Agency referred visitation to The Gathering Place "to better support visitation." M.N. missed the next two visits.

At the March 13, 2014 six-month review hearing, the court found M.N.'s progress to be minimal and ordered continued reunification services.

**The Agency's 12-Month Status Report and Addendum**

In its August 8, 2014 12-month status report, the Agency recommended termination of services and the scheduling of a section 366.26 hearing.

According to the Agency, M.N.'s progress on her case plan was still minimal. She began attending a Terra Firma substance abuse treatment program on May 8, but as of July 18, she had three unexcused absences and had attended only three of 10 Narcotics Anonymous meetings. When present, she participated in group but had " 'minimum insight into the recovery process . . . .' " She had completed the eight-session drug education component of the program.

In May, June, and July, M.N. had nine negative drug tests and five positive tests for opiates. She again produced prescriptions for Hydrocodone but had not provided a letter from her health care professional on the expected duration of her Hydrocodone use. She had missed eight tests in March, April, and June.

M.N. had attended only two counseling sessions with her individual therapist during the reporting period. She had met three times with her psychiatrist for management of her bipolar disorder medication.

M.N.'s progress on visitation was mixed. After her February 1 verbal altercation with Melissa, M.N. had been referred to The Gathering Place for supervised and therapeutic visits. As to how those visits had gone, the Agency reported:

"Ms. Perez [the family therapist] reports that [M.N.] participates in the family sessions with Roxanne, though she is often sick or tired and Roxanne has to gather the materials and bring them to [M.N.]. Ms. Perez reports that [M.N.] has gotten into argumentative conversations with The Gathering Place site supervisor . . . in front of Roxanne. [M.N.] has repeatedly brought her 16 year old best friend to visits, despite being told by the site manager that she was not an approved visitor. [M.N.] told the friend that the visit was going to be in the park, which is a public place, and the friend should just go to the park.

"Ms. Perez reports that [M.N.]'s behavior is unpredictable and she is prone to anger. [M.N.] is inappropriate in the visits by speaking disparagingly about Roxanne's

caregiver, talking about the case, being on her c[e]ll phone during the visits, and making promises to Roxanne about return[ing] home. Roxanne has cried in response to [M.N.] speaking badly about [Melissa] and Ms. Perez reports observing a negative impact on Roxanne when she witnesses [M.N.] having inappropriate interactions with others. Ms. Perez reports that [M.N.] has to be reminded to monitor the volume and tone of her voice at The Gathering Place due to the presence of other families."

The Agency advised that Roxanne appeared "comfortable" in her placement with Melissa. She had a strong connection with Melissa and got along with her cousins. Roxanne had been diagnosed with an anxiety disorder and separation anxiety when she was apart from Melissa. Her anxiety was the most prominent before and after her visits with M.N.

In an October 23 addendum, the Agency informed the court that M.N. was reportedly suffering from chemical meningitis. According to M.N., she had been hospitalized three times since September 9, for five days each time. She was taking Hydrocodone and Dilaudid for the pain associated with a back condition and would require surgery, although she did not know when that would occur.

M.N. reported that she was living with her grandmother at a mobile home park and intended for Roxanne to live with them. The child welfare worker had learned, however, that the park was a senior community and did not allow children under 18 years old to live there. Roxanne's father told the child welfare worker that M.N. in fact lived with a man from whom he had purchased drugs within the past year.

As of October 17, M.N. was in week 20 of the Terra Firma substance abuse treatment program and was in stage two (contemplation) of six stages. She had been placed on a modified program to accommodate her mobility and pain issues, and was attending individual but not group counseling. Her recent absences were excused due to her medical condition.

The family therapist reported that in family therapy M.N. engaged in inappropriate communication with Roxanne about her illness, and that Roxanne exhibited a lot of anxiety during counseling sessions. M.N. told Roxanne that she " 'could die' " and was

5

" 'in the hospital' " and told her about " 'the needle going in too far.' " These statements were disturbing to Roxanne, and M.N. needed to learn to communicate with her in age-appropriate ways. M.N. also continued to make disparaging remarks about Melissa during family therapy. On one occasion, Roxanne stated that she had two moms, M.N. and Melissa. M.N. became " 'very rough' " and yelled, " 'she's not your mom,' " causing Roxanne to " 'shut down and bec[o]me non-verbal.' " Roxanne was still experiencing anxiety and was working with a therapist to manage her feelings of anxiety, frustration, and sadness.

Similarly, Melissa reported that during supervised telephone calls, M.N. repeatedly complained to Roxanne about how much pain she was in and otherwise spoke to her inappropriately, causing Roxanne a great deal of upset.

Based on the foregoing, the Agency concluded that there was not a substantial likelihood that M.N. would be able to reunify even if reunification services were extended. Accordingly, it maintained its recommendation that the court terminate services.

**Contested 12-Month Review Hearing and the Agency's Addendums**

A contested 12-month review hearing commenced on October 29, 2104. Melissa and the child welfare worker testified, after which the matter was continued, first to November 12 and then December 10.

Prior to the December 10 hearing, the Agency submitted another addendum to its 12-month review report. It informed the court that M.N. continued to struggle with her medical condition. She had been hospitalized in mid-November, and had been prescribed Oxycodone and then Hydrocodone. She was awaiting approval for the surgical implant of a medical device to assist in pain management.

According to a report from Terra Firma, M.N. was "at [the] Contemplation Stage [of her substance abuse treatment program] and is connected with her sponsor and attending NA meetings regularly. She has returned to attending counseling groups, in addition to her individual sessions and attending anger management sessions with her Facilitator to continue to learn to manage her triggers. Her attitude is positive and is

6

responding well to disclosing her issues during the group process. She is aware her demeanor puts her in a negative light at times and she is working on this area and raising her self-awareness of family dynamics and past environments." She had eight excused absences for medical reasons.

The family therapist reported that on November 5, they had the " 'first and only family session that went well,' " attributing this to the fact that M.N. was calmer so Roxanne did not react negatively. In general, M.N.'s tardies cut into their therapy time, and Roxanne was " 'anxious, not comfortable.' "

The child welfare worker met with Roxanne on November 17. Roxanne told her that she did not like visiting with her mother, although she did not provide a reason why. Roxanne said she wanted to live with Melissa.

The contested 12-month review hearing resumed on December 10 with the testimony of the child welfare worker and M.N. The matter was then continued to January 23, 2015.

Prior to the resumption of the contested hearing, the Agency submitted a third addendum to its 12-month review report. In this one, the Agency informed the court that on December 11 (the day after the last hearing), Melissa sent the child welfare worker an e-mail reporting that while in the courthouse hallway, M.N. " 'stated that Marisol [Roxanne's maternal aunt] will get hers real soon and she better watch out that her house may burn down and she wished that Marisol were dead.' " Likewise, Marisol e-mailed the child welfare worker that M.N. " 'told me I need to watch my back that she was going to fight me and she was going to hurt my child. She was going to burn my house down and call child protective service on me again.' "

On December 24, the child welfare worker received a voicemail message from a supervisor at The Gathering Place who reported that M.N. was 25 minutes late to her visit that day so the visit had been canceled. When M.N arrived and learned of the cancellation, she " 'made a direct threat toward the caregiver. She said that, if she had to go to Modesto, she was going to go there and whip her ass.' " The supervisor also reported that M.N. " 'made veiled threats to me that we don't know her and she'll whip

7

the next person's ass that she sees and we don't know her and she'll do anything and she has nothing to lose.' "

On January 5, M.N. informed the child welfare worker that she had been served with a temporary restraining order that protected Melissa and her children from M.N.

On January 13, the child welfare worker received a report from Roxanne's first grade teacher, who advised that on days Roxanne visited with M.N., she " 'comes to school in a bad mood and is very clingy. Roxanne does not want to be here at school those days. She says she wants Melissa. She always wants to go home because she says she is feeling sick. She complains a lot and is not cooperative in class or on the playground,' " behaviors that were not typical for Roxanne.

On January 14, the Terra Firma program manager reported that M.N. had completed her primary program and started her aftercare program on December 19, 2014. She attended one session that day, never returned, and was terminated from the program.

The contested 12-month review hearing then resumed on January 23, 2015. At the beginning of the hearing, M.N. withdrew her contest and submitted. The court found that the Agency had provided reasonable services and that M.N. had made partial progress towards alleviating the causes necessitating Roxanne's placement. It further found that there was not a substantial probability Roxanne would be returned to M.N.'s custody within 18 months of removal, so it terminated reunification services and set the matter for a section 366.26 permanency hearing.

**The Agency's Section 366.26 Report and Addendum**

In its April 29, 2015 section 366.26 report, the Agency advised that M.N. continued to have weekly visits with Roxanne at The Gathering Place. As described in the report, "there are no concerns with these visits. The Gathering Place reported that the interactions between the mother and Roxanne are appropriate. In the past, The Gathering Place had concerns with the visits as the mother on more than one occasion brought an additional person with her to the visits and talked negatively about the caregiver. However, this appears to no longer be an issue."

The Agency noted that the proposed adoptive parents were relatives, had known Roxanne her entire life, and had cared for her for nearly the past two years. Roxanne had informed the child welfare worker on multiple occasions that she wanted to remain with her current caregivers. Despite the past issues with M.N., the caregivers were open to post-adoption contact between Roxanne and M.N., provided it could be done in a safe and appropriate manner.

Given the foregoing and M.N.'s failure to reunify with Roxanne, the Agency recommended that the court terminate M.N.'s parental rights and order a plan of adoption.

In a June 9 addendum to its section 366.26 report, the Agency provided visitation summaries from The Gathering Place for the therapeutic and supervised visits from June 2014 through May 2015. Melissa also submitted a caregiver information form, in which she advised the court that Roxanne was experiencing anxiety around the uncertainty of her future, she needed permanency, and M.N.'s inconsistency with calling and arriving on time to visits had lasting negative emotional effects for Roxanne.

**Contested Section 366.26 Hearing**

On August 18, 2015, a contested section 366.26 hearing was held, beginning with the testimony of two support counselors from The Gathering Place. The first, Monique Perry, had supervised M.N.'s and Roxanne's visits from May 2014 to January 2015. The one-hour visits were scheduled to occur weekly, although M.N. missed some visits. M.N. and Roxanne generally greeted each other with a hug and a kiss.

Ms. Perry testified that during the visits, M.N. would ask Roxanne about her week, and Roxanne generally responded to M.N.'s questions. They had what Ms. Perry described as "appropriate conversations," with M.N. engaged in what Roxanne was saying. She observed them doing activities such as coloring, puppet shows, puzzles, playing games, reading, and watching movies. During movies, they would generally sit together, cuddle, talk, and laugh. When a visit was over, M.N. and Roxanne would say goodbye, hug, and kiss. M.N. would say, "I love you," and Roxanne would say it back.

9

Ms. Perry witnessed Roxanne throw some tantrums (typically when she did not get her way), and M.N. responded by sitting her down and giving her a timeout. She also praised Roxanne for good behavior and comforted her. According to Ms. Perry, sometimes when M.N. set limits, Roxanne would withdraw, and the visits summary log confirmed that on at least one occasion, Roxanne did not want to visit with M.N.

Asha Robertson was the second support counselor to testify. She was the support counselor after Perry, having observed six or seven visits between April and May or June of that year. During that time period, M.N. missed one or two visits.

At the visits that Ms. Robertson observed, there were times when Roxanne would jump up, run to M.N., and greet her with a hug and kiss. Other times, Roxanne would say that she did not want to visit. Sometimes when Roxanne did not want to visit it was because there was something else she wanted to do, like go to a softball game; on other occasions, she said she did not want to "hang out" with M.N.

During the visits, M.N. and Roxanne would read books, paint their nails, play games, go to restaurants, and visit parks. Ms. Robertson observed them laughing and talking, and M.N. would listen to Roxanne. She observed M.N. praise Roxanne, and she was working on setting boundaries. She had heard Roxanne say that she loved M.N. and observed her hugging and kissing her mother.

M.N. also testified. Roxanne lived with her from her birth to her removal on September 19, 2013, when she was five and a half years old. Since her removal, M.N. maintained regular visitation with her. In the year and a half preceding the hearing, M.N. saw her about once a week, although she missed some visits due to her medical condition.

Asked about their family visits, M.N. testified that she and Roxanne would play games, paint their nails, go to the park, read books, watch movies, and go out to eat. When they were playing games, she would encourage Roxanne to play fairly and be a good sport, and she would let Roxanne win to "give her that boost of confidence." When they watched movies, they would cuddle together with blankets and eat popcorn and candy.

10

Since their therapeutic visits ended in March, their visits no longer took place at The Gathering Place, so they went on outings, mainly going out to eat. They would talk about how Roxanne's week was, if she had any concerns because school had just started, and what kind of extracurricular activities she was doing.

M.N. testified that when she and Roxanne would greet each other at a visit, she would ask Roxanne how she was doing and give her a hug and a kiss. Roxanne would respond with a hug and a kiss. At the end of a visit, M.N. would not say, "Bye," instead telling Roxanne, "I'll see you later," so Roxanne knows she will be there the next week.

When asked what they most enjoy doing together, M.N. answered, "I'd say being together. I just said being together. Because like I said, I've raised her since day one. And for me not to have her, just to comfort her, being with me, even though she can't be home with me. That would be it. It's not about me spending all this money, you know, to take her out. And, you know, that it's more of just being together."

When asked how she responds when Roxanne is upset and crying, M.N. testified, "I comfort her. I stay strong, like as strong as possible, because I don't want her to see me hurt, even though I'm hurt. But I comfort her and tell her, you know, whatever the issue is, that everything is going to be okay, you know."

After the close of testimony, counsel for M.N. urged the court not to terminate M.N.'s parental rights, arguing that the beneficial relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i) applied. The court found that M.N. had maintained regular visitation and contact with Roxanne as had been allowed. It did not find, however, that M.N. had met her burden of establishing that the relationship promoted Roxanne's wellbeing to such a degree to outweigh the benefit of being in a permanent home, reasoning as follows:

"So as it relates to the parental bond exception, the parent's burden is to prove that there is a beneficial relationship. But it cannot just be a random beneficial relationship, because most any child would benefit from hugs and kisses and care and positive energy coming from their biological mother. But it has to be a little more than that. The significant attachment from the child to the parent results from the adult's attention to the

11

child's need for physical care, nourishment, comfort, affection, and stimulation. And ultimately that there's been the development of a significant positive emotional attachment from child to parent.

"It's clear that Roxanne knows who her biological mother is. There's no doubt about that. It's also clear that under these circumstances she's also had the opportunity to bond with her aunt, and to feel some level of security and stability for her as well.

"There are two things I want to say. One is I don't think there's ever too many people who can love a child. I don't care how the adults get along or don't get along. I don't think there are ever too many people who can cocoon a child, love a child, support a child. That's necessary. It helps when the people get along, but it doesn't matter as long as that love is there and it's evident.

"The second thing I want to say is that it doesn't matter what order this Court makes, I can terminate parental rights, but I cannot terminate you as a mother, nor would I want to. Because I'm a mother, and I understand that bond. If we are at a point where parental rights are going to be terminated, my hope is based upon what I read in these reports, that there is an opportunity for progress and growth in the relationship between [M.N.] and [Melissa], because this baby is going to need that type of support from everybody.

"So based upon the evidence that the Court has heard today, it's clear that there is a relationship between mom and Roxanne. I don't think that it's a harmful relationship at all. But the question is whether or not that relationship promotes the wellbeing of Roxanne to such a degree to outweigh the wellbeing of Roxanne if she were in a permanent home with adoptive parents, namely her aunt. And what I don't find is that the burden for the parental bond exception has been met here.

"It makes me sad that mom has had some health issues. But hopefully they're turning around. It looks like they are. I'm hoping they do. And just the circumstances surrounding this case, I don't—it's clear that I think that everybody here would say that you've been trying. There's no doubt about that. But this is one of the higher burdens to meet in this type of courtroom. [¶] . . .

12

"[Y]ou have to show me that that relationship between your daughter and yourself is almost just like it was before the two of you parted. Where you're actively involved in her life in such a way that it's not just an incidental benefit to the child, but a parental benefit to the child. And that's hard. It's hard to do. Not that for lack of trying. It's just hard to do.

"I think there have been some stops and starts and some ups and downs during the visitation periods. I appreciate how hard you've worked to be appropriate with Roxanne and to engage her in a positive way while you're there, and to try not to put her in a position where she feels torn, because that's hard for her. It's my hope that we can talk about post-adoption visitation, and that we can start maybe that conversation today, because I think it might be important for her to continue this relationship. But I have to say that the Court does not find that the parental bond exception has been met in this case."

Accordingly, the court terminated M.N.'s parental rights and ordered adoption as the permanent plan for Roxanne.

This timely appeal followed.

## DISCUSSION

### The Applicable Statute

" 'At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child.' [Citation.] The court may order one of three alternatives: adoption, legal guardianship, or long-term foster care. [Citations.] 'Adoption, where possible, is the permanent plan preferred by the Legislature.' [Citation.] Adoption necessarily involves termination of the biological parents' legal rights to the child. [Citation.] Once the court determines by clear and convincing evidence that a child is likely to be adopted, the burden shifts to any party opposing adoption to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.]" (*In re D.O.* (2016) 247 Cal.App.4th 166, 173.)

One such exception exists where termination of parental rights would be detrimental to the minor because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  As noted, the juvenile court found this exception inapplicable.  M.N. contents this was error.  We disagree.

**Standard of Review**

As summarized in *In re J.C.* (2014) 226 Cal.App.4th 503, 530–531:

"Case law is divided as to the correct standard for appellate review of an order determining the applicability of the parental benefit exception.  Most published decisions have reviewed such orders for substantial evidence.  (See, e.g., *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333; [*In re*] *Autumn H.* [(1994)] 27 Cal.App.4th [567,] 576.)  Others have applied an abuse of discretion standard.  (See, e.g., [*In re*] *Jasmine D.* [(2000)] 78 Cal.App.4th [1339,] 1351; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

"Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).)  The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations.  'Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination.'  (*Id.* at p. 1314.)  The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a "*compelling reason* for determining that termination would be detrimental" ' to the child.  (*Id.* at p. 1315.)  This " ' "quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," is

14

appropriately reviewed under the deferential abuse of discretion standard.' (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [finding *Bailey J.* approach persuasive]; see *Bailey J.*, at p. 1315.) We are likewise persuaded to apply the *Bailey J.* approach."

Like the courts in *In re J.C.* and *In re K.P.*, we find the *Bailey J.* approach persuasive and shall apply that standard of review here.

**There Was No Error**

The first prong of the beneficial relationship exception requires that the parent has maintained regular visitation and contact with the child. (§ 366.26, subd. (c)(1)(B)(i).) The court found that requirement satisfied, and we thus need only address the second prong—whether M.N. demonstrated that Roxanne would benefit from continuing the relationship.

In *In re Autumn H., supra,* 27 Cal.App.4th 567 (*Autumn H.*), the court explained that "benefit" in this context means that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id.* at p. 575.) The *Autumn H.* court further explained that the exception is to be examined "on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Id.* at pp. 575–576; see also *In re Jasmine D., supra,* 78 Cal.App.4th at pp. 1349–1350.)

Here, the evidence showed that M.N. and Roxanne shared a "generally positive" relationship, as M.N. herself describes it in her opening brief. They engaged in fun activities during the visits, they displayed affection in the form of hugs, kisses, and

15

cuddling, and Roxanne often enjoyed her mother's company. But to overcome the statutory preference for adoption, M.N. was required to establish that she occupied a "parental role" in Roxanne's life resulting in Roxanne's significant, positive emotional attachment to her. As the court explained in *In re K.P., supra,* 203 Cal.App.4th at p. 621, "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (Accord, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.) While the relationship between M.N. was friendly and emotionally significant, it bore "no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

While evidence of a parent-child relationship was lacking, there was evidence that Roxanne's relationship with her mother caused her anxiety. She experienced more behavioral problems at school on the days she visited with M.N., and arrived at school " 'in a bad mood and [was] very clingy.' " M.N. was inappropriate when discussing her medical condition with Roxanne, causing Roxanne great distress. Roxanne became upset when M.N. disparaged Melissa in front of her. There were times when Roxanne did not want to visit with her mother. Roxanne had been diagnosed with an anxiety disorder that was most prominent before and after her visits with her mother. This evidence certainly undermines M.N.'s claim of a parental relationship that warranted protection.

M.N. argues at length that she and Roxanne developed a "strong, emotional parental relationship" during the five years that Roxanne was in her care. But the relevant concern is not the nature of the relationship *prior* to the dependency proceeding but rather at the time of the permanency hearing. And by the time of the hearing, Roxanne had spent nearly two years out of the custody of her mother and in the care of a family that provided her with love, consistency, and stability.

To be sure, the record showed that M.N. and Roxanne generally enjoyed each other's company during their weekly visits. But as the *Autumn H.* court noted, "Interaction between natural parent and child will always confer some incidental benefit

16

to the child . . . ." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)  And an incidental benefit is not enough to warrant application of the beneficial relationship exception.  Rather, the significant attachment required for the application of the beneficial relationship exception "results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."  (*Ibid*.)

The record before us supports the juvenile court's finding that such a relationship did not exist here.  We thus conclude that the court did not abuse its discretion finding that Roxanne's relationship with M.N. was not so significant and compelling that the benefit of its preservation outweighed the stability and benefits of adoption.  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 397.)

## DISPOSITION

The order terminating M.N.'s parental rights to Roxanne and ordering adoption as the permanent plan is affirmed.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.


A146269; *In re Roxanne S.*